Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
FILED

*September 23, 2024*

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| **UNITED STATES OF AMERICA** § | |
| § | |
| **v.** § | **Criminal No. 4:24-cr-00503** |
| § | **UNDER SEAL** |
| **HERNAN ALVAREZ**, § | |
| § | |
| § | |
| § | |
| **Defendant.** § | |

## INFORMATION

The United States Attorney charges:

## GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise specified:

Distributor Responsibilities under the Federal Controlled Substance Laws

1.     The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. Under the CSA, it was unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance except as authorized under the law.

2.     Title 21, United States Code, Section 822(b) authorized certain individuals and entities registered ("registrants") with Drug Enforcement Administration ("DEA"), including wholesale pharmaceutical distributors or "distributors," to manufacture, distribute, or dispense controlled substances.

3.     The DEA enforced the CSA and its implementing regulations by, among other things, approving distributors' registrations. The DEA also performed its distributor-related oversight functions by conducting audits and inspections, reviewing sales data and suspicious

1

order reports, and bringing enforcement actions against registrants that failed to comply with the CSA.

4.      A distributor was not authorized under the CSA to distribute or dispense controlled substances unless it maintained "effective controls and procedures to guard against theft and diversion [distribution outside authorized channels] of controlled substances," 21 C.F.R. § 1301.71(a), and could only receive a registration to distribute a controlled substance when in the public interest, that is, when the distributor maintained "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, research, or industrial channels," 21 U.S.C. § 823(b)(1), among other considerations.

5.      Distributors were required to "design and operate a system to identify suspicious orders," 21 U.S.C. § 832(a), and were further required to notify the DEA of any identified suspicious orders. Suspicious orders included "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

6.      Title 21, United States Code, Section 828(a) mandated that any registrant, such as a pharmacy, receiving Schedule II controlled drugs to issue a DEA Form 222 ("DEA 222"), which identified the type and quantity, of those drugs to the supplier, such as a distributor, who, pursuant to Section 828(d)(1), was also required to be a DEA registrant. Further, distributors were required to keep the DEA 222s for each distribution of a Schedule II controlled substance for a period of two years, and make them available for inspection and copying by the DEA. 21 C.F.R. § 1305.03; 21 U.S.C. § 828(c)(1). Under Section 828(e), it was unlawful for any person to use a DEA 222 to obtain controlled substances for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research.

7.      An appropriately licensed and registered pharmacy was authorized to dispense a controlled substance to a patient, but only pursuant to a valid prescription issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice.  21 C.F.R. §§ 1306.04, 1306.06.

8.      Title 21, United States Code, Section 841(a)(1) prohibited knowingly or intentionally distributing controlled substances outside the legitimate distribution chain, including by distributing controlled substances to a pharmacy, knowing or intending that the pharmacy would distribute or dispense the drugs without valid prescriptions—i.e., without prescriptions issued for a legitimate medical purpose in the usual course of a professional practice.

<u>The Greater Houston Area</u>

9.      The greater Houston area ("the Houston area") included the following counties in Texas: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

<u>The Commonly Abused Prescription Drugs</u>

10.      The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

11.      A controlled substance assigned to Schedule II meant that the drug had a high potential for abuse and a currently accepted medical use in treatment in the United States, or the drug had a currently accepted medical use with severe restrictions.

3

12.     Pursuant to the CSA and its implementing regulations:

a.      Oxycodone was classified as a Schedule II controlled substance. Oxycodone was used to treat moderate to severe pain and, as with other opioids, was highly addictive. Oxycodone HCL 30 mg ("oxycodone 30 mg") tablets were the highest-strength, short-acting pill form of the drug commercially available. Oxycodone had substantial street value and was in high demand on the Houston-area's illegal market.

b.      Hydrocodone was classified as a Schedule II controlled substance. Hydrocodone was used to treat severe pain. Hydrocodone, as with other opioids, was highly addictive. The 10/325 mg pill, often referred to as "Norco," was the highest, short-acting combination-pill form of the drug commercially available, and had substantial street value and was in high demand on the Houston-area's illegal market.

c.      Hydromorphone was classified as a Schedule II controlled substance. Hydromorphone was typically prescribed for moderate-to-severe pain relief when other medication was unsuccessful, and, as with other opioids, was highly addictive. The 8 mg pill was the highest-strength, short-acting pill form of the drug commercially available, and it had substantial street value and was in high demand on the Houston-area's illegal market.

(Collectively, oxycodone, hydrocodone, and hydromorphone, in the strengths referenced above, are "Commonly Abused Opioids.")

d.      "Potentiators," so-called because they enhanced the high from opioids like oxycodone, hydrocodone, and hydromorphone, included carisoprodol, a Schedule IV controlled substance classified as a muscle relaxant; alprazolam, a Schedule IV controlled substance used to treat anxiety; and promethazine with codeine, a Schedule V controlled substance classified as a cough suppressant. All had substantial street value and were in high demand on the Houston-area's illegal market.

(Collectively, Commonly Abused Opioids and Potentiators are "Commonly Abused Prescription Drugs.")

4

**<u>DEFENDANT AND RELEVANT ENTITIES AND INDIVIDUALS</u>**

13. Salus Medical LLC ("Salus") was an Arizona company established on or about May 21, 2012. Salus, located in Phoenix, Arizona, became a DEA-registered distributor in or around September 2015.

14. Salus sold Commonly Abused Prescription Drugs to pharmacies, primarily located in the Houston area ("Houston-area pharmacies").

15. Salus employed internal sales staff who communicated with Houston-area pharmacies, acquired Houston-area pharmacies as customers, and coordinated sales of Commonly Abused Prescription Drugs to Houston-area pharmacies. Salus paid its internal sales staff, at least in part, on commission.

16. Defendant **HERNAN ALVAREZ**, who resided in Phoenix, Arizona, was the President of Salus.

17. Sales Manager 1, who resided in Phoenix, Arizona, was a Salus employee, beginning in or around August 2015. Sales Manager 1 was first a sales representative and later Salus's National Sales Director.

18. Compliance Manager 1, who resided in Phoenix, Arizona, was a Salus employee, beginning in or around April 2017. Compliance Manager 1 was first an office assistant and later Salus's Compliance Manager.

19. Sales Representative 1, who resided in Phoenix, Arizona, was a Salus sales representative, beginning in or around April 2018.

20. Salus also contracted with "Brokers," external sales staff who coordinated sales between with pharmacy customers on behalf of Salus. Salus paid the Brokers on commission.

## COUNT ONE
### Conspiracy to Unlawfully Distribute and Dispense Controlled Substances
### (21 U.S.C. § 846)

21.     Paragraphs 1 through 20 of this Information are re-alleged and incorporated by reference as if fully set forth herein.

22.     Beginning in or around April 2015, and continuing through in or around July 2023, the exact dates being unknown to the United States Attorney, in the Houston Division of the Southern District of Texas and elsewhere, Defendant

### HERNAN ALVAREZ

knowingly and intentionally combined, conspired, confederated, and agreed with Sales Manager 1, Compliance Manager 1, Sales Representative 1, Brokers, operators of Houston-area pharmacies, and others known and unknown, to violate Title 21, United States Code, Section 841(a)(1) and (b)(1)(C), that is, to knowingly and intentionally distribute and dispense, in a manner they knew and intended was not authorized, mixtures and substances containing a detectable amount of controlled substances, including:

  a.  the Schedule II controlled substances oxycodone, hydrocodone, and hydromorphone;

  b.  the Schedule IV controlled substances carisoprodol and alprazolam;

  c.  the schedule V controlled substance promethazine with codeine; and

  d.  other controlled substances.

### Purpose of the Conspiracy

23.     It was the purpose and object of the conspiracy for Defendant **HERNAN ALVAREZ** and his co-conspirators to unlawfully enrich themselves by, among other things: (a) distributing and causing to be distributed, via Salus, controlled substances to  Houston-area

6

pharmacies, knowing and intending that the pharmacies would distribute and dispense the controlled substances without a legitimate medical purpose outside the usual course of professional practice; (b) generating large profits and commissions from distributing and dispensing the controlled substances; and (c) diverting the proceeds from those controlled substance sales for the personal use and benefit of Defendant **HERNAN ALVAREZ** and his co-conspirators.

### Manner and Means of the Conspiracy

The manner and means by which Defendant **HERNAN ALVAREZ** and co-conspirators sought to accomplish the purpose and object of the conspiracy included, among other things:

***Registration***

24.    On or about September 22, 2015, Salus obtained a DEA registration number that authorized it to distribute and dispense controlled substances in conformity with the CSA. As a distributor, Salus was required to maintain effective controls against diversion and was responsible for reporting suspicious orders to the DEA.

***Defendant's and Co-Conspirators' Roles***

25.    **HERNAN ALVAREZ**, in his role as President, oversaw Salus's daily operation. **HERNAN ALVAREZ** had decision-making authority over all aspects of Salus's business, including the sale of controlled substances to pharmacies and the submission of suspicious activity reports to DEA. Prior to founding Salus, **HERNAN ALVAREZ** worked at Wholesaler 1, where he coordinated distribution of Commonly Abused Prescription Drugs to many of the same Houston-area pharmacies that later became Salus customers.

26.    Sales Manager 1, as National Sales Director, supervised sales representatives and oversaw Salus's distribution of controlled substances to pharmacy customers. Sales Manager 1, as a sales representative, oversaw Salus's distribution of controlled substances to pharmacy

customers. **HERNAN ALVAREZ**, through Salus, paid Sales Manager 1 a salary, plus a commission for sales, including sales of Commonly Abused Prescription Drugs to Houston-area pharmacies.

27.    Compliance Manager 1, as Salus's Compliance Manager, oversaw Salus's purported "due diligence" on pharmacy customers. Compliance Manager 1 had decision making authority over the number and types of controlled substances Salus distributed to pharmacy customers. As Compliance Manager, Compliance Manager 1, together with **HERNAN ALVAREZ**, was responsible for reporting suspicious orders to DEA. **HERNAN ALVAREZ**, through Salus, paid Compliance Manager 1 a salary, plus a commission for some sales, including sales of Commonly Abused Prescription Drugs to Houston-area pharmacies.

28.    Sales Representative 1, as a sales representative, oversaw Salus's distribution of controlled substances to pharmacy customers. **HERNAN ALVAREZ**, through Salus, paid Sales Representative 1 a salary, plus a commission for sales, including sales of Commonly Abused Prescription Drugs to Houston-area pharmacies.

29.    Defendant **HERNAN ALVAREZ**, along with Sales Manager 1, Compliance Manager 1, Sales Representative 1, the Brokers, and others associated with Salus were aware of the legal requirements imposed on Salus as a DEA registered distributor.

### *Houston-Area Business Model*

30.    Despite Salus being located in Arizona, from approximately 2015 through 2022, only approximately 1% of Salus's reported sales to pharmacies were in Salus's home state, Arizona. The majority of Salus's pharmacy sales and profits came from selling Commonly Abused Prescription Drugs to Houston-area pharmacies. Of the approximately 21.5 million dosage units of Commonly Abused Opioids that Salus sold to pharmacies nationwide, approximately 18.6

million dosage units, or 86%, were sold by Salus to Houston-area pharmacies. And the Commonly Abused Opioids comprised more than 99% of all Schedule II and Schedule III-narcotic pills that Salus sold to Houston-area pharmacies during that timeframe.

31.    **HERNAN ALVAREZ** and his co-conspirators knew that the Houston area was a "hot zone" for diversion. **HERNAN ALVAREZ** was specifically warned about "misuse and abuse being rampant" in the Houston area by one of Wholesaler 1's suppliers.

32.    On or about May 17, 2017, **HERNAN ALVAREZ** and Sales Manager 1 met with officials from the DEA to discuss the CSA, DEA's role enforcing the CSA, and Salus's obligations under the CSA. **HERNAN ALVAREZ** and Sales Manager 1 were informed of the following, among other things:

   a.   The requirements for distributing and dispensing controlled substances;

   b.   Distributors' requirements to provide effective controls against diversion;

   c.   Known dangers associated with Commonly Abused Prescription Drugs;

   d.   Salus's obligation to know its customers and perform due diligence;

   e.   Red Flags for Salus to look out for in its pharmacy customers; and

   f.   Salus's sales of Commonly Abused Opioids to certain Houston-area pharmacies.

33.    Despite those warnings, **HERNAN ALVAREZ** and his co-conspirators targeted certain Houston-area pharmacies about which Wholesaler 1 and DEA expressed concern, because those pharmacies were willing to pay higher prices for Commonly Abused Prescription Drugs than would any legitimate pharmacy customer. **HERNAN ALVAREZ**, Compliance Manager 1, Sales Manager 1, Sales Representative 1, and the Brokers knew that certain Houston-area pharmacies could and would pay Salus's inflated prices for Commonly Abused Prescription Drugs because the drugs would ultimately be sold, without a legitimate medical purpose and outside the usual

9

course of professional practice, mainly to street-level drug dealers willing to pay far more, in cash, than what a legitimate pharmacy could or would charge.

34. To avoid detection by law enforcement while taking advantage of the large profit margins available from selling Commonly Abused Prescription Drugs to Houston-area pharmacies, **HERNAN ALVAREZ** and his co-conspirators designed and implemented a purported compliance system intended to give the *appearance* of an effective system of controls against diversion, when in fact the system's purpose was to *facilitate* sales of Commonly Abused Prescription Drugs to Houston-area pharmacies while staying under law enforcement's radar.

35. Among other things, as part of Salus's purported due diligence, prospective Houston-area pharmacy customers had to fill out applications that, **HERNAN ALVAREZ** and his co-conspirators knew, contained false representations about the nature and extent of the prospective pharmacy customers' controlled-substance business.

36. **HERNAN ALVAREZ**, via Salus, required both prospective and active Houston-area pharmacy customers to submit to Salus drug-usage reports ("DURs"), which **HERNAN ALVAREZ** and his co-conspirators knew were suspect.

37. To avoid detection and distort the actual ratio of controlled substances sold, **HERNAN ALVAREZ**, via Salus, capped the amounts of controlled substances any single Houston-area pharmacy could purchase per month and required the Houston-area pharmacies to purchase large quantities of non-controlled pharmaceuticals that **HERNAN ALVAREZ** and his co-conspirators knew the pharmacies neither needed nor wanted.

38. Salus changed little to nothing about its system even as **HERNAN ALVAREZ** and his co-conspirators were made aware of its Houston-area pharmacies' unlawful distribution of Commonly Abused Prescription Drugs. The means by which **HERNAN ALVAREZ** and his co-

10

conspirators were made aware of its Houston-area pharmacies' arrests, trouble with the Texas State Board of Pharmacy, and other malfeasance included press releases containing information about diversion-related law-enforcement action against the pharmacies; subpoenas from law enforcement and oversight agencies concerning the pharmacies; and reports compiled by third-party consultants hired by Salus to conduct "site visits" that often corroborated the red flags evident throughout Salus's purported due diligence files on the pharmacies.

39. Despite that nearly all Salus's Houston-area pharmacies exhibited suspicious purchasing activity, which was known to **HERNAN ALVAREZ**, Sales Manager 1, Compliance Manager 1, Sales Representative 1, and the Brokers, Salus rarely submitted suspicious order reports to DEA.

40. **HERNAN ALVAREZ** and his co-conspirators were also aware that Salus's Houston-area pharmacies strongly preferred the colors and brands of Commonly Abused Prescription Drugs that had the highest street value. For example, the Houston-area pharmacies' preference for blue oxycodone 30 mg pills was so pronounced that Salus could and did charge more for blue oxycodone 30 mg than other colors of oxycodone 30 mg. **HERNAN ALVAREZ** and his co-conspirators understood that the Houston-area pharmacies' brand and color preferences were not based on any legitimate medical purpose.

### _Relationships with Houston-Area Pharmacies_

41. Through Sales Manager 1, Sales Representative 1, and the Brokers, Salus maintained direct relationships with the individuals associated with Salus's Houston-area pharmacies. **HERNAN ALVAREZ**, Sales Manager 1, Sales Representative 1, and the Brokers were aware that these individuals would often affiliate with new pharmacies after encountering trouble with law enforcement or regulators at their old ones. That knowledge did not deter

11

**HERNAN ALVAREZ** and his co-conspirators from selling controlled substances with these individuals at their new locations, which **HERNAN ALVAREZ** and his co-conspirators knew distributed and dispensed Commonly Abused Prescription Drugs without a legitimate medical purpose and outside the usual course of professional practice.

*Golden USA Pharmacy*

42.     Beginning in or around November 2015, and continuing through October 2018, Salus sold Commonly Abused Prescription Drugs and non-controlled substances to Golden USA Pharmacy, located in Houston, Texas. Golden USA Pharmacy was Salus's top pharmacy customer, both in terms of number of drugs purchased (controlled substances and total number of drugs), and in gross profit. During that timeframe, Salus distributed to Golden USA Pharmacy approximately 755,500 pills of hydrocodone 10 mg. Salus never sold another strength of hydrocodone to Golden USA Pharmacy. During that same period, Salus distributed to Golden USA Pharmacy approximately 402,400 pills of oxycodone, approximately 97% of which were 30 mg. Salus's internal distribution records indicate that during that same period, Salus distributed to Golden USA Pharmacy approximately 817,000 Potentiator pills, along with approximately 1,019,315 mL of promethazine with codeine syrup.

43.     Prior to opening Salus, **HERNAN ALVAREZ** was Wholesaler 1's sales representative for Golden USA Pharmacy. Sales Manager 1 was Golden USA Pharmacy's sales representative, while **HERNAN ALVAREZ** approved Golden USA Pharmacy's application and reviewed Golden USA Pharmacy's DURs. Sales Manager 1 coordinated Salus's sales to Golden USA Pharmacy in exchange for a commission. **HERNAN ALVAREZ** received repeated warnings about red flags of diversion at Golden USA Pharmacy, both before opening Salus and from Salus's third-party inspector. Despite these warning and red flags, **HERNAN ALVAREZ** and Sales

12

Manager 1 repeatedly increased the number of Commonly Abused Prescription Drugs that Golden USA Pharmacy could purchase from Salus. Salus never submitted a suspicious order report to DEA regarding Golden USA Pharmacy.

44.    Beginning in or around November 2015, and continuing through October 2018, **HERNAN ALVAREZ** and Sales Manager 1 caused Salus to distribute and dispense Commonly Abused Prescription Drugs to Golden USA Pharmacy, knowing and intending that Salus did not have effective controls against diversion, and knowing and intending that Golden USA Pharmacy would distribute and dispense the controlled substances it purchased from Salus without a legitimate medical purpose outside the usual course of professional practice. Golden USA Pharmacy did in fact distribute and dispense the controlled substances it purchased from Salus, without a legitimate medical purpose and outside the usual course of professional practice, often to street-level drug dealers and/or based on forged and fraudulent prescriptions.

*Keystone Pharmacy*

45.    Beginning in or around November 2015, and continuing through in or around December 2021, Salus sold Commonly Abused Prescription Drugs and non-controlled substances to Keystone Pharmacy, located in Houston, Texas. During that timeframe, Salus distributed to Keystone Pharmacy approximately 496,000 pills of hydrocodone 10 mg and approximately 99,000 pills of oxycodone 30 mg. Salus never sold another strength of hydrocodone or oxycodone to Keystone Pharmacy. Salus also sold Keystone Pharmacy approximately 431,500 Potentiator pills, along with approximately 135,751 mL of promethazine with codeine syrup.

46.    Prior to opening Salus, **HERNAN ALVAREZ** was Wholesaler 1's sales representative for Keystone Pharmacy. At Salus, Sales Manager 1 was Keystone Pharmacy's sales representative, and he coordinated Salus's sales to Keystone Pharmacy in exchange for a

13

commission. **HERNAN ALVAREZ**, Compliance Manager 1, and Sales Manager 1 were aware of red flags of diversion at Keystone Pharmacy from Salus's third-party inspector, from the Texas State Board of Pharmacy, and from Keystone Pharmacy's application. Despite the red flags, Salus never submitted a suspicious order report to DEA regarding Keystone Pharmacy.

47.     Beginning in or around November 2015, and continuing through in or around December 2021, **HERNAN ALVAREZ** and Sales Manager 1 caused Salus to distribute and dispense Commonly Abused Prescription Drugs to Keystone Pharmacy, knowing and intending that Salus did not have effective controls against diversion, and knowing and intending that Keystone Pharmacy would distribute and dispense the controlled substances it purchased from Salus without a legitimate medical purpose and outside the usual course of professional practice. Keystone Pharmacy did in fact distribute and dispense the controlled substances it purchased from Salus, without a legitimate medical purpose and outside the usual course of professional practice, often to street-level drug dealers.

*Pharmacy K*

48.     Beginning in or around November 2015, and continuing through in or around July 2023, Salus sold Commonly Abused Prescription Drugs and non-controlled substances to Pharmacy K, located in Houston, Texas. During that timeframe, Salus distributed to Pharmacy K approximately 767,000 pills of hydrocodone 10 mg and approximately 178,400 pills of oxycodone 30 mg. Salus never sold any another strength of hydrocodone or oxycodone to Pharmacy K. Salus also distributed to Pharmacy K approximately 840,000 Potentiator pills and approximately 3,784 mL of promethazine with codeine syrup.

49.     Sales Manager 1 was Salus's sales representative for Pharmacy K, and he coordinated Salus's sales to Pharmacy K in exchange for a commission. **HERNAN ALVAREZ**,

14

Compliance Manager 1, and Sales Manager 1 were aware of red flags of diversion at Pharmacy K from Salus's third-party inspector, from the Texas State Board of Pharmacy, from the warnings of another 822b-Registrant, and from Pharmacy K's application. Despite the red flags, **HERNAN ALVAREZ**, Sales Manager 1, and Compliance Manager 1, through Salus, distributed controlled substances to Pharmacy K.

50.     On or about August 29, 2019, Compliance Manager 1 prepared a suspicious order report on behalf of Salus for Pharmacy K. Compliance Manager 1's purported reason for the suspicious order report was "USAGE."  Despite reporting Pharmacy K's usage as suspicious, Salus continued selling Commonly Abused Prescription Drugs to Pharmacy K through July 2023.

51.     Beginning in or around November 2015, and continuing through in or around July 2023, **HERNAN ALVAREZ**, Compliance Manager 1, and Sales Manager 1 distributed Commonly Abused Prescription Drugs to Pharmacy K, knowing and intending that Salus did not have effective controls against diversion, and knowing and intending that Pharmacy K would distribute and dispense controlled substances without a legitimate medical purpose and outside the usual course of professional practice. In fact, Pharmacy K did in fact distribute and dispense the controlled substances it purchased from Salus, without a legitimate medical purpose and outside the usual course of professional practice, often to street-level drug dealers.

*The SPG Pharmacy Group*

52.     SPG Pharmacy Care, Bammel Pharmacy, Gulfbank Pharmacy, Red Oak Pharmacy, Silveridge Pharmacy, and Memorial Pharmacy (the "SPG Pharmacy Group") were all Houston-area pharmacies that shared common ownership, control, and employees.

53.     Beginning in or around November 2015, and continuing through in or around October 2017, Salus distributed to the SPG Pharmacy Group approximately 640,000 pills of

hydrocodone 10 mg and approximately 516,000 pills of oxycodone 30 mg. Salus did not report selling any another strength of hydrocodone or oxycodone to the SPG Pharmacy Group. During that same period, Salus distributed to the SPG Pharmacy Group approximately 708,500 Potentiator pills and approximately 683,958 mL of promethazine with codeine syrup.

54.     Prior to opening Salus, **HERNAN ALVAREZ** was Wholesaler 1's sales representative for many of the SPG Pharmacy Group pharmacies. In that capacity, **HERNAN ALVAREZ** received a warning linking four the SPG Pharmacy Group pharmacies to Golden USA Pharmacy, and describing suspicious activity at Golden USA Pharmacy and those four SPG Pharmacy Group pharmacies. At Salus, Sales Manager 1 was the sales representative for the SPG Pharmacy Group, and he coordinated Salus's sales to the SPG Pharmacy Group in exchange for a commission. **HERNAN ALVAREZ** and Sales Manager 1 knew that the SPG Pharmacy Group shared common ownership, management, and employees. **HERNAN ALVAREZ** and Sales Manager 1 were aware of red flags of diversion with the SPG Pharmacy Group from the DEA, from Salus's third-party inspector, from the Texas State Board of Pharmacy, from the warnings of another distributor, and from the SPG Pharmacy Group's applications. Despite the red flags, Salus never submitted a suspicious order report to DEA regarding any of the SPG Pharmacy Group pharmacies.

55.     Beginning in or around November 2015, and continuing through in or around October 2017, **HERNAN ALVAREZ** and Sales Manager 1 caused Salus to distribute and dispense Commonly Abused Prescription Drugs to the SPG Pharmacy Group, knowing and intending that Salus did not have effective controls against diversion, and knowing and intending that the SPG Pharmacy Group would distribute and dispense the controlled substances it purchased from Salus without a legitimate medical purpose and outside the usual course of professional

16

practice. The SPG Pharmacy Group did in fact distribute and dispense the controlled substances it purchased from Salus, without a legitimate medical purpose and outside the usual course of professional practice, often to street-level drug dealers.

*K Med Pharmacy*

56.     Beginning in or around June 2017, and continuing through in or around January 2022, Salus distributed to K Med Pharmacy approximately 165,700 pills of hydrocodone 10 mg, approximately 136,100 pills of oxycodone 30 mg, and 23,000 pills of hydromorphone 8 mg. Salus never sold another strength of hydrocodone or hydromorphone to K Med Pharmacy, and sold K Med only 500 pills of any strength of oxycodone other than 30 mg. During that same period, Salus distributed to K Med Pharmacy approximately 160,400 Potentiator pills, along with approximately 550,000 mL of promethazine with codeine syrup.

57.     Sales Manager 1, then Sales Representative 1 were Salus's sales representatives for K Med Pharmacy, and they coordinated Salus's sales to K Med Pharmacy in exchange for a commission. **HERNAN ALVAREZ**, Compliance Manager 1, Sales Representative 1, and Sales Manager 1 were aware of red flags of diversion at K Med Pharmacy from Salus's third-party inspector, from the Texas State Board of Pharmacy, and from K Med Pharmacy's application. Despite the red flags, Salus never submitted a suspicious order report to DEA regarding K Med Pharmacy.

58.     Beginning in or around June 2017, and continuing through in or around January 2022, **HERNAN ALVAREZ**, Sales Representative 1, Compliance Manager 1, and Sales Manager 1 caused Salus to distribute Commonly Abused Prescription Drugs to K Med Pharmacy, knowing and intending that Salus did not have effective controls against diversion, and knowing and intending that K Med would distribute and dispense the controlled substances it purchased from

17

Salus without a legitimate medical purpose and outside the usual course of professional practice. K Med did in fact distribute and dispense the controlled substances it purchased from Salus, without a legitimate medical purpose and outside the usual course of professional practice, including by selling controlled substances, often in bulk, to street-level drug dealers, without the involvement of physicians, patients, or prescriptions.

*Aldine Family Pharmacy*

59.    Beginning in or around September 2019, and continuing through in or around January 2020, Salus sold Commonly Abused Prescription Drugs and non-controlled substances to Aldine Family Pharmacy, located in Houston, Texas. During that timeframe, Salus distributed to Aldine Family Pharmacy approximately 9,000 pills of hydrocodone 10 mg, approximately 11,800 pills of oxycodone 30 mg, and 2,000 pills of hydromorphone 8 mg. Salus never sold another strength of hydrocodone, oxycodone, or hydromorphone to Aldine Family Pharmacy. Salus also distributed to Aldine Family Pharmacy approximately 25,000 Potentiator pills, along with approximately 10,000 mL of promethazine with codeine syrup.

60.    Sales Representative 1 was Salus's sales representative for Aldine Family Pharmacy and coordinated Salus's sales to them in exchange for a commission. **HERNAN ALVAREZ**, Compliance Manager 1, Sales Representative 1, and Sales Manager 1 were aware of red flags of diversion at Aldine Family Pharmacy from Salus's third-party inspector, from the Texas State Board of Pharmacy, from an Aldine Family Pharmacy employee, and from their applications. Despite the red flags, Salus never submitted a suspicious order report to DEA regarding Aldine Family Pharmacy.

61.    Beginning in or around September 2019, and continuing through in or around January 2020, **HERNAN ALVAREZ**, Sales Representative 1, Compliance Manager 1, and Sales

18

Manager 1 caused Salus to distribute Commonly Abused Prescription Drugs to Aldine Family Pharmacy, knowing and intending that Salus did not have effective controls against diversion, and knowing and intending that Aldine Family Pharmacy would distribute and dispense the controlled substances it purchased from Salus without a legitimate medical purpose and outside the usual course of professional practice. Aldine Family Pharmacy did in fact distribute and dispense the controlled substances it purchased from Salus, without a legitimate medical purpose and outside the usual course of professional practice, including by selling controlled substances, in bulk, to street-level drug dealers, without the involvement of physicians, patients, or prescriptions. In fact, Aldine Family Pharmacy was never legally authorized to dispense controlled substances in Texas because it never had a pharmacist-in-charge listed with the Texas State Board of Pharmacy.

*Pharmacy Plus Health*

62.     Beginning in or around May 2020, and continuing through in or around October 2020, Salus sold Commonly Abused Prescription Drugs and non-controlled substances to Pharmacy Plus Health, located in Houston, Texas. During that timeframe, Salus distributed to Pharmacy Plus Health approximately 15,000 pills of hydrocodone 10 mg, approximately 14,000 pills of oxycodone 30 mg, and 15,000 pills of hydromorphone 8 mg. Salus never sold another strength of hydrocodone, oxycodone, or hydromorphone to Pharmacy Plus Health. During that same period, Salus distributed to Pharmacy Plus Health approximately 71,500 Potentiator pills, along with approximately 5,676 mL of promethazine with codeine syrup.

63.     Sales Representative 1 was Salus's sales representative for Pharmacy Plus Health and coordinated Salus's sales to them in exchange for a commission. **HERNAN ALVAREZ**, Compliance Manager 1, Sales Representative 1, and Sales Manager 1 were aware of red flags of

19

diversion at Pharmacy Plus Health.  Despite the red flags, Salus never submitted a suspicious order report to DEA regarding Pharmacy Plus Health.

64.     Beginning in or around May 2020, and continuing through in or around October 2020, **HERNAN ALVAREZ**, Sales Representative 1, Compliance Manager 1, and Sales Manager 1 caused Salus to distribute Commonly Abused Prescription Drugs to Pharmacy Plus Health, knowing and intending that Salus did not have effective controls against diversion, and knowing and intending that Pharmacy Plus Health would distribute and dispense the controlled substances it purchased from Salus without a legitimate medical purpose and outside the usual course of professional practice. Pharmacy Plus Health did in fact distribute and dispense the controlled substances it purchased from Salus, without a legitimate medical purpose and outside the usual course of professional practice, including by selling controlled substances, in bulk, to street-level drug dealers, without the involvement of physicians, patients, or prescriptions. In fact, Pharmacy Plus Health was never legally authorized to dispense controlled substances in Texas because it never had a pharmacist-in-charge listed with the Texas State Board of Pharmacy.

*NA Pharmacy*

65.     Beginning in or around December 2020, and continuing through in or around May 2021, Salus sold Commonly Abused Prescription Drugs and non-controlled substances to NA Pharmacy, located in Houston, Texas. During that timeframe, Salus distributed to NA Pharmacy approximately 13,500 pills of hydrocodone 10 mg, approximately 9,000 pills of oxycodone 30 mg, and 1,500 pills of hydromorphone 8 mg. Salus never sold another strength of hydrocodone, oxycodone, or hydromorphone to NA Pharmacy. During that same period, Salus distributed to NA Pharmacy approximately 15,500 Potentiator pills, along with approximately 8,500 mL of promethazine with codeine syrup.

20

66.    Sales Representative 1 was Salus's sales representative for NA Pharmacy and coordinated Salus's sales to NA Pharmacy in exchange for a commission. **HERNAN ALVAREZ**, Compliance Manager 1, and Sales Representative 1 were aware of red flags of diversion at NA Pharmacy, including from the Texas State Board of Pharmacy and from NA Pharmacy's application.  Despite the red flags, Salus never submitted a suspicious order report to DEA regarding NA Pharmacy.

67.    Beginning in or around December 2020, and continuing through in or around May 2021, **HERNAN ALVAREZ**, Sales Representative 1, and Compliance Manager 1 caused Salus to distribute Commonly Abused Prescription Drugs to NA Pharmacy, knowing and intending that Salus did not have effective controls against diversion, and knowing and intending that NA Pharmacy would distribute and dispense the controlled substances it purchased from Salus without a legitimate medical purpose and outside the usual course of professional practice. NA Pharmacy did in fact distribute and dispense the controlled substances it purchased from Salus, without a legitimate medical purpose and outside the usual course of professional practice, including by selling controlled substances, in bulk, to street-level drug dealers, without the involvement of physicians, patients, or prescriptions.

*Pharmacy H*

68.    Beginning in or around December 2020, and continuing through in or around July 2021, Salus sold Commonly Abused Prescription Drugs and non-controlled substances to Pharmacy H, located in Houston, Texas. During that timeframe, Salus distributed to Pharmacy H approximately 25,500 pills of hydrocodone 10 mg and approximately 23,000 pills of oxycodone 30 mg. Salus never sold another strength of hydrocodone to Pharmacy H. During that same period,

21

Salus distributed to Pharmacy H approximately 24,000 Potentiator pills, along with approximately 14,190 mL of promethazine with codeine syrup.

69.    Sales Representative 1 was Salus's sales representative for Pharmacy H and coordinated Salus's sales to Pharmacy H in exchange for a commission. **HERNAN ALVAREZ**, Compliance Manager 1, and Sales Representative 1 were aware of red flags of diversion at Pharmacy H. Despite the red flags Salus never submitted a suspicious order report to DEA regarding Pharmacy H.

70.    Beginning in or around December 2020, and continuing through in or around July 2021, **HERNAN ALVAREZ**, Sales Representative 1, and Compliance Manager 1, caused Salus to distribute Commonly Abused Prescription Drugs to Pharmacy H, knowing and intending that Pharmacy H did not have effective controls against diversion, and knowing and intending that Pharmacy H would distribute and dispense the controlled substances it purchased from Salus without a legitimate medical purpose and outside the usual course of professional practice. Pharmacy H did in fact distribute and dispense the controlled substances it purchased from Salus, without a legitimate medical purpose and outside the usual course of professional practice.

71.    The Brokers acted as Salus's sales representatives for the following Houston-area pharmacies, among others, that distributed and dispensed Commonly Abused Prescription Drugs without a legitimate medical purpose and outside the usual course of professional practice: TX United Pharmacy, Creative Care Pharmacy, Cornerstone Pharmacy, and Pharmacy N. **HERNAN ALVAREZ** and Compliance Manager 1 managed the Brokers for Salus and approved Salus's sales of Commonly Abused Prescription Drugs to the Houston-area pharmacies that purchased through the Brokers.

*Response to February 2022 Enforcement Action Against Wholesaler 2*

72. In or around February 2022, DEA publicly announced an enforcement action against Wholesaler 2, located in Tennessee. In response to DEA's enforcement action against Wholesaler 2, **HERNAN ALVAREZ**, Sales Manager 1, Compliance Manager 1, Sales Representative 1, the Brokers, and their co-conspirators made changes to Salus's controlled-drug distribution protocols to disguise Salus's unlawful sales of Commonly Abused Prescription Drugs to Houston-area pharmacies.

73. In the wake of the enforcement action against Wholesaler 2, Supplier 1 warned **HERNAN ALVAREZ**, Compliance Manager 1, and Salus about suspicious pharmacy customers. **HERNAN ALVAREZ** and Compliance Manager 1 in turn informed Sales Manager 1, Sales Representative 1, and other Salus employees about Supplier 1's warning. Despite Supplier 1's warning, Salus continued selling to some of the pharmacies Supplier 1 warned about, and instead just stopped sending controlled substances Salus purchased from Supplier 1 to those pharmacies.

74. Although Salus increased the frequency of reporting suspicious order reports to DEA after February 2022, many suspicious orders remained unreported. **HERNAN ALVAREZ** and Compliance Manager 1 inconsistently applied criteria for reporting suspicious orders to DEA.

All in violation of Title 21, United States Code, Section 846.

## NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853)

75. The allegation contained in Count 1 of this Information is hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853.

76. Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Section 846, Defendant

23

**HERNAN ALVAREZ**

shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offense and any property used, and intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offense.

If any of the property described above, as a result of any act or omission of the Defendant:

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred or sold to, or deposited with, a third party;

      c.  has been placed beyond the jurisdiction of the court;

      d.  has been substantially diminished in value; or

      d.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to a money judgment and forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

ALAMDAR S. HAMDANI
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

*Devon Helfmeyer*

DEVON HELFMEYER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE